## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SUSAN SAUD, et al.,

        Plaintiffs,

        v.

FORD MOTOR COMPANY,

        Defendant.

Case No. 1:23-cv-251

JUDGE DOUGLAS R. COLE

### OPINION AND ORDER

Susan Saud exited her Ford Escape believing it to be in Park. It wasn't. When it started moving backward, Susan tried to jump back in the open door to stop the vehicle. But instead, she fell, and the Escape rolled backwards over her, crushing her pelvis. So the Sauds sued Ford, asserting product liability under various theories, common-law negligent design (which was dropped later), and loss of consortium (a claim by Susan's husband, which is derivative of Susan's claims). Defendant Ford Motor Company now moves for summary judgment on all outstanding claims, (Doc. 67), and in connection with that, seeks to exclude Plaintiffs' experts, (Docs. 68, 69, 70). For the reasons discussed below, the Court **GRANTS in part and DENIES in part** the various motions to exclude. (Docs. 68, 69, 70). The Court also **GRANTS in part and DENIES in part** Ford's Motion for Summary Judgment (Doc. 67). Specifically, the Court **GRANTS** the motion as to the misrepresentation and failure to warn claims, but the Court **DENIES** the motion as to the design defect claim.

## BACKGROUND

### A.    Factual History.

In February 2018, the Sauds purchased a brand-new 2018 Ford Escape. (A. Saud Dep., Doc. 53, #787; S. Saud Dep., Doc. 54, #863). Three years later, on September 17, 2021, Susan[1] drove the Escape to pick up an item that she had purchased through Facebook Marketplace from another family, the Darkos. (Doc. 54, #877–78). She arrived at the Darkos' home, parked in their driveway behind one of their vehicles, and retrieved the item. (*Id.* at #878). She then re-entered her Escape, started it, and shifted into reverse. (*Id.* at #879). But she realized that she had not paid for the item. (*Id.*). So, after shifting (or at least intending to shift) the Escape back into Park, she quickly exited the vehicle. (*Id.*). But as she stepped around her open driver's door, she "heard [and] felt something." (*Id.*). She turned to see the Escape rolling down the Darkos' driveway. (*Id.* at #880). In an effort to stop the vehicle, Susan tried to get back into the car through the open door and put her foot on the brake pedal. (*Id.*). But while she managed to get her leg into the car, she could not reach the brake pedal. (*Id.*). Instead, she fell alongside the vehicle, and its left front wheel ran backwards over her midsection before she could avoid it, crushing her pelvis. (*Id.* at #881).

The Escape kept going. It made a U-turn from the driveway, onto the Darkos' yard, and then back up towards their house. (E. Darko Dep., Doc. 50, #683; Doc. 62-2

---

[1] Because Plaintiffs share a last name, the Court will refer to them individually by their first names.

(photo of the scene after the incident)). Thankfully, one of the Darkos' neighbors ran over and stopped it. (Doc. 50, #683).[2] Soon after, police arrived, and Susan was transported to a hospital. (Doc. 54, #885). The Sauds did not take the car to a mechanic to inspect the vehicle immediately following the incident. (Doc. 53, #807). Rather, they gave it to their son for him to use at college. (*Id.*; Doc. 54, #864).

In September 2022, though, about a year and a half after the accident, the Sauds took the Escape to a mechanic, Bluegrass Diesel. (Doc. 54, #864, 873). They did so because they had learned that their 2018 Escape was potentially subject to a safety recall, 22S43. (Def.'s Proposed Undisputed Facts, Doc. 67-1, #2339; Pls.' Resp. to Def.'s Proposed Undisputed Facts, Doc. 82-1, #5241). This recall addressed an issue that some 2018 Escapes had with shifting the vehicle into Park. (Recall Notice, Doc. 62-4, #1500). Specifically, the notice described the risk as:

> A damaged or missing bushing could prevent the shifter from moving the transmission into the intended gear position and cause the vehicle to move in an unexpected direction. The transmission may not be in the park position, even though the shifter position indicates that the vehicle was shifted to park. Exiting a vehicle without the transmission in the park position and without application of the parking brake may allow the vehicle to roll, increasing the risk of injury or crash.

(*Id.*). But this recall only applied if the "transmission shifter cable bushing is damaged or missing." (*Id.*). After inspection, Bluegrass Diesel concluded the Sauds' Escape did not suffer from that defect. (Doc. 54, #873). But Bluegrass Diesel went

---

[2] Ford highlights that, in Ms. Darko's deposition, she claims that the neighbor told her that he had to shift the car into Park to stop it. (Doc. 67, #2312 (citing Doc. 50, #686)). The neighbor was never deposed, nor has he provided an affidavit. And Ms. Darko's account of what he said is inadmissible hearsay. So, the Court finds it is not properly part of the record for summary judgment. *See* Fed. R. Civ. P. 56(c).

beyond simply checking to see if there was a problem with the cable bushing; it also "[p]arked [the] unit on a hill and tried to get it to pop out of gear." (*Id.*; Bluegrass Diesel Invoice, Doc. 62-5, #1502). After that, it concluded the "unit works as it should at this time." (Doc. 54, #873; Doc. 62-5, #1502). So the recall did not apply and does not help explain the Sauds' accident.

Those facts are not in dispute. (*See* Response, Doc. 82, #5220 ("[T]he underlying facts are basically uncontested.")). Rather, having ruled out the recall issue, one question is what *did* cause the vehicle to rollaway. Even on that front, there is at least some agreement. For example, both sides agree that if the Escape was fully latched in Park when Susan exited the vehicle for the second time, the vehicle would not have rolled down the driveway. (Doc. 67-1, #2340; Doc. 82-1, #5242 (admitting that if Susan had placed the Escape in Park, "it would not have come out of that gear nor moved backward")). Because the Escape did in fact roll down the driveway, something else must have happened. And that's where the stories diverge.

The Sauds place the blame on the vehicle. Susan's version goes as follows: when she re-entered the Escape after retrieving the item, she "put [her] seat belt on first, turned it on, [and] put it in reverse." (Doc. 54, #879). And when she realized she had not paid Ms. Darko, she "put it *back in park*, took [her] seat belt off, opened the door, got out, [and] walked a couple steps." (*Id.* (emphasis added)). As further support, she points to the responding EMT's report, the ER nurse's report, the helicopter nurse's report, and Susan's supplemental police narrative, all of which state Susan informed them she thought she placed the car in Park. (Brausch Dep., Doc. 48, #625;

Crash Rep. Suppl., Doc. 62-9, #1511; West Chester Hosp. Emergency Dep't Rec., Doc. 79-20, #4964; UC Health Rec., Doc. 79-21, #4966).

But if that is right, if she shifted the car into Park, how did it start moving? The Sauds claim that the Escape was experiencing what they call "false park." (Doc. 82, #5205). That is where the "shifter's gear selection mechanism [is] perched between 'Park' and 'Reverse.'" (*Id.*). It is akin, Susan says, to flipping a light switch and the switch getting stuck in the middle. (Doc. 54, #857). When the shifter is perched between the two gears, the vehicle allegedly can then "'self-shift' to Reverse with no driver input." (Doc. 82, #5205). In other words, because the vehicle is not fully latched in Park (even though the driver believes it is), it can slide back to Reverse, which allows the vehicle to start moving backwards.

Ford offers a simpler version of events. It says that, in her hurry to pay the Darkos, Susan did not put the car back into Park. (Doc. 67, #2309). As a result, it was still in Reverse when she exited—and thus capable of rolling. (*Id.*). For support, Ford points to the initial police report, which states that the vehicle was in Reverse when she exited. (Doc. 62-8, #1505). As for the amended narrative to which Susan cites, Ford argues she revised the narrative a year and a half later, after consulting with legal counsel. (Doc. 67, #2312 n.2). It was in that amendment that Susan reported that she placed the car in Park before exiting, (Doc. 62-9, #1511; Doc. 67, #2312 n.2).[3] As for how the vehicle temporarily stopped, according to Ford's expert, the wheels

---

[3] The police officer who assisted Susan with supplementing the original crash report stated that Susan wished to revise it because the original stated the vehicle ran over both of her legs, even though it rolled over her pelvis area. (Walker Dep., Doc. 55, #974).

caught on an uneven edge in the driveway, and slight pressure or movement pushed the vehicle over that edge. (Thornton Report, Doc. 64-5, #2194–95). According to Ford, false park—i.e., the gear selector being perched between Park and Reverse—is not even possible, and it certainly did not occur in this case. (Doc. 67, #2316–17).

## B.    The Car Itself.

It turns out, though, that the false park dispute is something of a red herring. Plaintiffs now make clear that they are not claiming the vehicle is defective because of the possibility of false park. (*See* Doc. 82, #5205). Rather, they say the defect is the lack of an automatic Electronic Parking Brake (EPB) feature that would automatically engage the EPB if the vehicle detects that the driver has exited the vehicle while the car is still in gear. (*Id.*). So to understand the nature of *that* dispute, one needs a better understanding of the innerworkings of the Escape's brake system. The Court turns to that topic now, starting with an overview of the vehicle, and then drilling down to discuss its braking-system components.

Start with the basics. The Sauds owned a 2018 Ford Escape Titanium, the compact SUV's "top-of-the-line" model. (Doc. 53, #787; Doc. 54, #844, 863). They also purchased the "Safe & Smart" package, which included safety features like a lane-keeping system, adaptive cruise control, collision warning, and blind spot warning. (Doc. 54, #864). Overall, the 2018 Ford Escape received a five-star NHTSA safety rating. (NHTSA Rating, Doc. 62-11).

Now let's focus on the brake system. Ford equipped the 2018 Escape with a mechanical, floor-mounted gear shifter and EPB.[4] (Fyie Decl., Doc. 65-1, #2258). The photo below showcases the gear shifter with the parking brake button below it:



(Doc. 67, #2310). To shift using the mechanical gear shifter, "the driver presses down on the brake pedal, presses the button on the front of the gear selector, and moves the gear selector to the desired gear." (Doc. 65-1, #2258). If the driver wishes to engage the EPB, the driver lifts the EPB switch, and conversely, presses down to release it. (*Id*. at #2259). Because the parking brake is electric—rather than mechanical—when activated, it "sends an electronic signal that then engages the physical parking brake." (Doc. 67, #2310). Importantly, the EPB included in the 2018 Escape did not apply automatically; it engaged only when the driver pushed the button. (Owner's Manual, Doc. 63-2, #1688).

---

[4] The parties vacillate between calling it an electric parking brake and an electronic parking brake. Apparently, both names refer to the same feature, and it is common in the industry to use the two labels interchangeably. (Stoloff Report, Doc. 64-3, #2113 ("[T]he terms 'Electric Park Brake' and 'Electronic Park Brake' are often used interchangeably in the industry and are taken to mean the same.")).

Susan was familiar with the EPB; she set it every day "[b]ecause [she] live[s] on a hill." (Doc. 54, #854). She had not had problems with the EPB or shifting the car into Park in general before this incident. (*Id.* at #864; Doc. 53, #790). As far as how she generally went about putting the car in Park, Susan would use a "fluid motion" to "push [the shift lever] forward" until she "felt resistance." (Doc. 54, #859). When shifting, she does not look at either the gear shifter or the dashboard. (*Id.* at #856). She says the motion only takes a fraction of a second. (*Id.* at #859).

As the Sauds also note, Ford later introduced a feature called "Return to Park" into some of its vehicles, including the 2020 Escape. (Doc. 65-1, #2274). As the name suggests, this feature will automatically shift the car into Park when certain conditions occur that suggest the driver is exiting the vehicle without first placing it in Park. (*Id.*). It also automatically applies the EPB as a backup. (Stoloff Report, Doc. 64-3, #2124). Importantly, though, the Return to Park feature only works with vehicles that have an electronic shifter (typically, the rotary dial gear selector). (*Id.*). The 2018 Ford Escape, by contrast, had a mechanical shifter. (*Id.*). Ford implemented an electronic shifter in the 2020 Escape, though, so Ford incorporated the Return to Park feature at that time. (*Id.*).

That said, the 2018 Ford Escape did have an EPB. (Doc. 67-1, #2332; Doc. 82-1, #5240). And, as one of the Sauds' experts notes, Ford could have implemented an automatic EPB on the vehicle, even though Ford could not have implemented the Return to Park feature (as the vehicle had a mechanical shifter). (Doc. 64-3, #2121).

8

## C.    Procedural History.

Because the Sauds believe the car's design is to blame for Susan's injuries, they sued Ford on May 1, 2023. (Compl., Doc. 1). They originally raised three claims: (1) product liability under Ohio's statute, (2) common-law negligent design, and (3) loss of consortium.[5] (*Id.* at #2–4). The Sauds further offer four theories why the vehicle is defective to support their statutory product liability claim: (1) a manufacturing defect under Ohio Revised Code § 2307.74; (2) a design defect under § 2307.75; (3) a failure to warn under § 2307.76; and (4) misrepresentation under § 2307.77. (*Id.* at #2–3). In their Complaint, the Sauds identify the core of the design defect as the "failure of the vehicle to remain secure when shifted to Park, and the failure to automatically activate the Electric Parking Brake when the driver exited the vehicle with the transmission not in Park or the vehicle otherwise unsecured." (*Id.* at #3).

Ford answered, (Doc. 8), and shortly after, the Sauds voluntarily dismissed the second claim (common-law negligent design) with prejudice, (Docs. 10, 12). The case was later reassigned to the undersigned, (Doc. 17), and discovery proceeded. Multiple issues arose during discovery, including issues of attorney-client privilege, the timing of discovery, and the alleged incompleteness of document production. (*See, e.g.,* 8/28/24 Min. Entry (ordering Ford to "take all reasonable steps to fully complete

---

[5] The third "claim" is not an independent, free-standing claim. Rather, it confers a cause of action on the spouse of someone who has suffered physical injury due to a tort. *See Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 391 (Ohio 1992) (citing *Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 258 N.E.2d 230, 235 (Ohio 1970)). As a result, it cannot survive absent one or more viable underlying claims. *Id.* at 392.

document production"); 4/30/25 Min. Entry (discussing "remaining disputes over Defendants assertions of privilege")).

More significantly for present purposes, the parties engaged experts and undertook extensive discovery related to those experts. As relevant here, the Sauds retained three experts to support their various defect theories: Joseph Stidham, Paul Stoloff, and Dr. William Vigilante.

First, Stidham is an accident reconstructionist. He tested the vehicle and opines that false park was indeed possible and most likely occurred here. (Doc. 82, #5223–24). He also concluded that an automatic EPB would have prevented the rollaway in the event of false park. (Doc. 89, #5445).

The second expert, Stoloff, proposes to testify about the feasibility of implementing an automatic EPB in the 2018 Escape. (Doc. 82, #5222). He has had extensive experience implementing just such a feature for a competing car company, Chrysler. (*Id.*). Specifically, he led the effort to install what Chrysler calls SafeHold in the 2014 Jeep Grand Cherokee. (*Id.*; Stoloff Dep., Doc. 60, #1212). In his report, he also briefly remarked that he, too, was able to repeatedly put the car in false park. (Doc. 64-3, #2115–22).

Third, Dr. Vigilante is the Sauds' human factors expert. He proposes to testify about vehicle design steps one can take to minimize safety risks, how Ford failed to do so, and how the 2018 Escape's warnings were insufficient. (Doc. 82, #5223). As to the latter, though, given that (in his view) the risk could be ameliorated with a safety feature (an  automatic EPB), "any warning Ford provided instead of the available

10

safety feature would not be considered adequate regardless of how effective it may or may not be." (Doc. 64-4, #2175).

Ford, meanwhile, retained its own accident reconstructionist, Dana Thorton (Thornton Dep., Doc. 93, #5558; *see* Doc. 64-5 (report)). He primarily opines that the vehicle most likely was still in Reverse and only initially stopped due to uneven cracks in the driveway. (Doc. 64-5, #2194–95). Based on his review of Stidham's testing and other literature, he concludes it is unlikely false park occurred here. (*Id.* at #2210–11). Specifically, Thornton cites a study of 65 adults who performed approximately 1,000 gear shifts into Park, and not once did someone achieve false park; in fact, contrary to the false park theory's underlying assumption that drivers typically apply too little force to the shift lever when moving the lever from Reverse to Park, most of the time the drivers in the study applied *more* force than was necessary to move the gear shift into Park. (*Id.* at #2210).[6]

### D.     Motion for Summary Judgment.

On August 6, 2025, Ford moved for summary judgment on the two remaining counts (product liability and loss of consortium). (Doc. 67). As noted, though, the first count encapsulates a variety of theories. Ford seeks summary judgment on all of them.

To start, it argues that Plaintiffs lack evidence to support their manufacturing defect and misrepresentation claims. (*Id.* at #2309). The focus of its Motion though is

---

[6] The Sauds do not challenge the admissibility of Thornton's testimony, so the Court does not analyze his testimony below.

11

the design defect claim. Ford maintains that "simply because it was feasible to add all the latest features," i.e., the automatic EPB, does not mean the Escape was defective for not having one, and so the claim fails as a matter of law. (*Id.*). Ford further argues that Plaintiffs have failed to offer admissible evidence to demonstrate that the vehicle was likely in "false park." (*Id.* at #2309–10 (cleaned up)). As for the remaining failure to warn claim, Ford argues that Susan admits she ignores all the warnings, so it is mere speculation to believe a different warning would have prevented her injuries. (*Id.* at #2324–27).[7] In addition to its summary judgment motion, Ford also moved to exclude the Sauds' three experts: Stoloff, Dr. Vigilante, and Stidham. (Docs. 68, 69, 70).

The Sauds' briefing clarifies and narrows the issues a bit. First, they concede that they no longer make a manufacturing defect claim. (Doc. 82, #5205). So that leaves them with a design defect claim, a failure to warn claim, and a misrepresentation claim. But as to the first of those, the Sauds' briefing also makes clear that they are relying on the lack of an automatic EPB, rather than on the existence of "false park" as the claimed defect. (*Id.*). They point to the possibility of the latter (false park) merely as evidence as to why Ford's failure to implement an automatic EPB rendered the vehicle defective (for the design defect claim), necessitated better warnings (for the failure to warn claim), and made Ford's

---

[7] The summary judgment motion does not expressly address the loss of consortium claim. As noted above, though, loss of consortium is not a free-standing claim, but rather derivative of some underlying claim. *See* supra note 5. Accordingly, if Ford is not liable on the product liability claim (and recall that the Sauds already dismissed their common-law negligent design claim), then Ford is not liable on the loss of consortium claim.

representations that the vehicle was safe false (for the misrepresentation claim). (*Id.* at #5223–36). The basic idea is that the vehicle rollaway here (and the accompanying injuries) would not have occurred if (1) the EPB applied automatically, (2) Susan had received better warnings, or (3) Ford had not misrepresented the vehicle's safety. (*See id.*).

In support of the design defect claim, they argue that they offer sufficient admissible evidence, including their experts' testimony, to create a genuine dispute over the foreseeable risks of vehicle rollaway and the benefits of an automatic EPB as an alternative design. (Doc. 82, #5222–24, 5228–32). And they similarly argue that Dr. Vigilante's testimony creates a genuine dispute as to whether Ford included an adequate warning. (*Id.* at #5233–35). On the remaining misrepresentation claim, the Sauds point to statements from Ford that they use "state-of-the-art" technology "whenever practicable," as well as the fact they bought the "Safe and Smart" package as a result of Ford's express safety representations. (*Id.* at #5235–36). Because the vehicle was defective for the above reasons, they argue, the vehicle did not conform to these representations. (*Id.*).

Ford replied, (Doc. 98), and the motions to exclude are fully briefed, (Docs. 86, 88, 89, 95, 97, 99). With that, the matter is ripe for review.

## LEGAL STANDARD

The Court addresses two different kinds of motions in this Opinion: a motion for summary judgment and several motions to exclude evidence. Not surprisingly, different standards apply.

Start with the motion for summary judgment. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant meets its burden, though, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347. A party must support any assertions with evidence such as depositions, documents, affidavits, or other admissible evidence (or at the very least citing material that could "be presented in a form that would be admissible in evidence"). Fed. R. Civ. P. 56(c)(1)–(2). If there is "a complete failure of proof concerning an essential element of the nonmoving party's case," then the Court will treat "all other facts [as] immaterial." *Celotex*, 477 U.S. at 323. And the nonmoving party cannot defeat summary judgment merely by pointing to *any* factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (brackets and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). That is, the dispute must be both "genuine" (i.e., supported by evidence) and go to a "material fact" (i.e., a fact that could change the outcome).

14

Essentially, the appropriateness of summary judgment turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). And in making that determination, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

In addition to moving for summary judgment, Ford also filed three motions to exclude expert testimony. (Docs. 68, 69, 70). Federal Rule of Evidence 702 allows certain witnesses with specialized knowledge to testify as experts at trial. But admitting expert testimony is not a decision a court should make lightly, as juries tend to place extra weight on expert opinions. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 595 (1993) (noting that expert opinions can be "powerful"). Accordingly, courts serve an important "gatekeeping" role when it comes to expert witnesses, ensuring that the jury does not encounter misleading opinions. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (acknowledging that district courts have a "gatekeeping" obligation as to all types of expert testimony); *Best v. Lowe's Home Ctr., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009) (stating that district courts have an obligation to exclude "junk science"). That said, the Court "is not intended to serve as a replacement for the adversary system." *Owners Ins. Co. v. Security Nat'l Ins. Co.*, No. 1:21-cv-2520, 2024 WL 531250, at *3 (D. Colo. Feb. 9, 2024) (quotation

omitted). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

The Court's gatekeeping role involves three basic inquiries: qualifications, relevance, and reliability. As to the first, the Court must determine whether a proposed witness is qualified as an expert according to his or her "knowledge, skill, experience, training, or education." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702). Turning to the second, relevance under the Federal Rules of Evidence is a lenient standard. *Daubert*, 509 U.S. at 587. Evidence is relevant so long as it relates to a fact at issue and helps the jury determine that fact at issue. *Id.* at 591; Fed. R. Evid. 702. But testimony is not relevant if it simply presents information or conclusions that the jury can reach on its own. *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

Finally, the Court must assess reliability. *Daubert*, 509 U.S. at 589–90. The concept of "reliability" implies that an expert's opinion must be based on something "more than subjective belief or unsupported speculation." *Id.* at 590. In assessing reliability, the Court looks to: (1) whether the testimony rests upon sufficient facts or data; (2) whether the testimony is the product of reliable principles and methods; and (3) whether the expert has applied the principles and methods reliably to the facts of the case. *In re Scrap Metal*, 527 F.3d at 529 (citing Fed. R. Evid. 702). And the Supreme Court, in *Daubert*, "provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony," including: "testing, peer

16

review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In re Scrap Metal*, 527 F.3d at 529 (quoting *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).

Finally, the Advisory Committee notes to the 2023 Amendment to Rule 702 also emphasize that "expert testimony *may not* be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." (emphasis added) (citing Fed. R. Evid. 104(a)).

## LAW AND ANALYSIS

Ford moves for summary judgment on the Sauds' claims and moves to exclude the Sauds' proposed experts. (Doc. 67, #2307; Docs. 68, 69, 70). But, because the Court considers only admissible evidence in evaluating whether summary judgment is warranted, Fed. R. Civ. P. 56(c), the Court begins by evaluating Ford's three motions to exclude expert testimony before turning to the summary judgment motion. Ultimately, the Court grants the motion to exclude as to Stidham, (Doc. 70), and grants in part and denies in part as to the latter two, (Docs. 68, 69). Then, based on the record that remains after those evidentiary determinations, the Court grants in part and denies in part Ford's Motion for Summary Judgment (Doc. 67). Specifically, the Court will allow the design defect claim to move forward, but grants Ford judgment as a matter of law on the failure to warn and misrepresentation claims.

## A.    Motions to Exclude Expert Testimony

The Court starts with Stidham's proposed testimony because his opinion undergirds aspects of the other two experts' opinions. Then, the Court will discuss Stoloff's conclusions, before ending with an analysis of Dr. Vigilante's findings.

### 1.    The Court Excludes Joseph Stidham's Expert Testimony.

Joseph Stidham is an accident reconstructionist. (*See* Doc. 82, #5223). It is perhaps surprising that the Sauds intend to call him, given that they concede "[t]here is little to 'reconstruct' here." (Doc. 89, #5440). The limited issue this case presents is "how and why the vehicle remained stationary while [Susan] exited, and how and why the vehicle began rolling backwards after her exit." (*Id.*). That said, Plaintiffs claim that Stidham's proffered testimony is an important part of establishing the possibility of false park, and they further contend that the possibility of false park is one reason Ford should have implemented an automatic EPB. (Doc. 82, #5224–25). On the false park front, Stidham says he conducted the requisite testing on the Sauds' vehicle and concluded that false park was not only possible, but readily achieved. (*Id.* at #5224). Moreover, he opined that false park most likely explained why the vehicle initially remained stationary while Susan exited it. (Doc. 89, #5446). Beyond his false park testimony, his results led him to conclude that an automatic EPB would have prevented the vehicle rollaway and Susan's injuries. (*Id.* at #5445–46).

As described above, in assessing expert testimony, the Court considers qualifications, relevance, and reliability. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589–91. When it comes to Stidham's opinions about false park, the Court has concerns as

18

to at least the first and last. Start with qualifications. Stidham is an accident reconstructionist, and the Court does not quibble with his qualifications in that field. But when it comes to the likelihood of a particular transmission setup in a particular vehicle achieving false park, that is a *mechanical* question, not an accident-reconstruction question. And Ford says Stidham is not qualified to testify about automotive mechanics (i.e., the inner workings of how vehicles operate). (Doc. 70, #2396–97). Moreover, Stidham himself readily admits he is not an expert in false park. (Doc. 59, #1047 ("Q: You are not holding yourself out as an expert in false park, correct? A: I am not.")). Perhaps that is why the Sauds do not even bother to respond to the qualifications question, beyond arguing that Stidham did not need to be a "master mechanic" in order to test and opine about the ease of false park. (Doc. 89, #5451). But, if by that they mean that the 'testing' he undertook does not require expertise, and that anyone can do it, that is its own separate problem. Experts are supposed to testify on issues beyond a typical lay person's knowledge. *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) ("[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person."). So the Court finds Stidham is not qualified to opine about the likelihood that the Ford Escape at issue suffered false park on the day of the accident.

Moreover, even if he were qualified, the 'testing' he conducted was not reliable. An expert's testimony must be the "product of reliable principles and methods." Fed. R. Evid. 702(c). And "[p]reparation by an expert which involves beginning with a goal … and working backwards to meet the goal … is the antithesis of reliable and

19

scientific." *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 820–21 (C.D. Ill. 2009). But working backwards to meet the goal is exactly what Stidham did here. He went into his testing with the goal in mind of trying to achieve false park by any means possible. Rather than apply a neutral testing method to see whether the Escape could achieve false park in normal operation, Stidham intentionally moved the shifter back and forth until he claims to have achieved it. (Doc. 70, #2390–93, 2396). Indeed, Stoloff, the other expert present, described the testing as Stidham "trying to get it into a false park." (Doc. 60, #1180). That is a damning description, as working backward in this way "cannot withstand *Daubert* scrutiny and is not due any credence in a court of law." *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 786 (S.D. Tex. 2000).

Beyond that, "if [the expert] is unable to specify what type of methodology [he] employed in this case, it is impossible … to evaluate the propriety of that methodology." *Flagstar Bank,* 687 F. Supp. 2d at 819–20 (quoting *Collier v. Bradley*, 113 F. Supp. 2d 1235, 1244–45 (C.D. Ill. 2000)). Here, Stidham did not lay out any methodology, such as if there was a certain number of shifts he planned to perform, whether he intended to shift in a standard way each time, or if he planned to wiggle the shifter for a prescribed amount of time on each attempt. His report certainly describes no protocols. (*See* Doc. 64-1, #2091). He simply states, "SRI took part in the testing of [the] vehicle on 04-11-2023 in Youngstown, Ohio with Paul Stoloff. We identified that it was possible to get the Ford Escape in a false park setting and then,

at times, the Ford Escape would stay in false park for a brief period of time and then slip in reverse." (*Id.*).

Moreover, having reviewed the videos of the 'testing,' the Court agrees with Stoloff's description of it as basically standardless. Stidham carefully and deliberately moves the gear shifter back and forth between Park and Reverse. Often, when Stidham lets go of the gear shifter, it immediately goes into Reverse or Park; it does not remain in between. On some attempts, though, after moving the gear shifter around for over ten seconds each time, Stidham admittedly manages to get the gear shifter to remain in a neutral position between Park and Reverse. And at another point, Stidham claims that it is easier to achieve false park when the driver lets go of the release on the front of the shifter while shifting. It is unclear how many times he attempted shifting with or without releasing the button. But after seemingly letting go of the release midway through shifting, Stidham achieves a neutral position. In the video, he says, "I don't know what difference that makes, but that's what I'm finding."

That is not reliable expert testing. His intentional movements of the shifter did not "involve[] any scientific methodology, but rather consisted of reverse-engineering a theory to fit the desired outcome." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016). Moreover, one reason that a reliable methodology is essential is so that the results are replicable. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). But when asked if someone else could recreate his results, Stidham answered no and admitted that "all of the things that

21

[he] did on [his] demonstrations were random." (Doc. 59, #1051). That simply does not satisfy Rule 702's or *Daubert*'s standards for establishing anything about the likelihood of false park here.

Moreover, even putting that aside, there is another problem. Even if the Court were to consider the instances where false park supposedly occurred, Stidham failed to shift in any way resembling the manner in which Susan, or frankly any ordinary driver, would. Rule 702(d) requires that the expert reliably apply "the principles and methods to the facts of the case." Indeed, "the proponent of the evidence must show that the replication and the experiment are substantially similar." *Jackson v. E-Z-Go Div. of Textron, Inc.,* 326 F. Supp. 3d 375, 405 (W.D. Ky. 2018) (quotation omitted). Susan stated that to shift to Park, she uses a "fluid motion" to "push it forward" until she "fe[els] resistance," lasting less than a fraction of a second. (Doc. 54, #859). By contrast, Stidham admitted during his deposition that his method of gingerly moving the shifter was not how Susan shifted nor how people shift generally. (Doc. 59, #1051, 1055 ("I showed that it was possible that it did, but not—not in shifting it in a normal manner.")). This is not a reliable application of any method to the facts of this case, which further renders his opinions inadmissible as a means of proving what actually happened here.

There is even less to say about the testing of the "exemplar shifters" Stidham purchased on eBay. (Doc. 64-1, #2092). The only thing Stidham notes is, "SRI has tested these shifters multiple times. We learned that these shifters will go into a false park position as well." (*Id.*). Moving a gear shifter on a table setup that is completely

detached from any vehicle, and in an unknown condition, is not a reliable method of establishing whether false park might actually happen in the field and the conditions under which it might occur. (*See* Doc. 59, #1048–49 (admitting he has "no idea where they came from," did not document the tests, and "held it against the desk and hit the brake interlock release, had to release it, and then moved it")). His testing lacks any methodology, barely has any description, and does not resemble the facts of this case. The Court does not even have footage of the testing to analyze it. At the very least, the Sauds would need testimony from a mechanical expert, which Stidham admits he is not, to establish a link between testing outcomes that occur on a standalone shifter and the likelihood of achieving the same outcomes when that shifter is installed in a vehicle. But the Sauds have no such testimony to offer here. In sum, the Court cannot accept this as reliable expert testimony.

So what is left? Stidham asserts that besides false park, one of the mechanical factors causing the accident was the "lack of automatic EPB when the driver exits the vehicle not in park." (Doc. 64-1, #2092). He further adds that "[d]espite Ms. Saud's potential error (Human Factor) in not placing the gear shifter in park, and her not setting the electronic park brake manually, if the Ford Escape would have simply been programmed to automatically set the park brake like the 2020 model, this non-traffic crash would not have occurred." (*Id.*). His only 'evidence' about the need for an automatic parking brake, though, is a Ford survey where 50% of its employees "rarely, or never, appl[ied] the EPB," and a Google AI summary of the usage of

parking brakes. (*Id.* at #2087–88).[8] From there, he concludes Ford should have known of the risk of vehicle rollaways from drivers not parking their vehicles. (*Id.* at #2092). Similarly, he asserts that vehicles equipped with either an automatic EPB or automatic Return to Park (RTP) (where the vehicle infers the driver is exiting the vehicle and shifts the vehicle into Park) "are much safer." (*Id.*).

But those opinions fall short in two ways. First, Stidham fails to provide the evidence necessary to support his conclusion that an automatic EPB would have prevented the crash. He simply asserts that vehicles equipped with the feature, or the similar automatic RTP, are "much safer." (*Id.*). He points to no data, nor any studies, nor other research that would demonstrate that fact. Moreover, even if such cars are "much safer" overall, it is a leap to conclude that, if the Ford Escape here had an automatic EPB, it would have prevented the crash. And Stidham lacks any expert qualifications to make such an assertion. True, Stoloff is a different story on the qualifications front (which the Court addresses below). But Stidham's opinion about the role that an automatic EPB would or would not have played in preventing this accident amounts to little more than ipse dixit. *Zenith Elecs. Corp.*, 395 F.3d at 420 ("[E]xperts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

---

[8] Stidham does not provide any citation for this survey. Based on the Court's review of the record, however, he may be referring to a 2015 survey the Plaintiffs filed. (Doc. 78-20).

24

Relatedly, to the extent that Stidham's assertions (i.e., that an automatic EPB may have prevented the accident) make some logical sense, they follow basic common sense that a jury could follow on their own. Rule 702 requires that the expert's specialized knowledge "help the trier of fact to understand the evidence or to determine a fact in issue." Indeed, "expert testimony is not admissible unless it will be helpful to the factfinder. Such testimony is unhelpful when it merely deals with a proposition that is not beyond the ken of common knowledge." *Sutton v. Kroger Ltd. P'ship I*, No. 3:20-cv-495, 2022 WL 3009501, at *8 (E.D. Tenn. July 28, 2022) (citation modified). Sure, there is some intuitive sense that an automatic parking brake could offer an additional means to stop a vehicle rollaway if the driver fails to place the vehicle in Park. But any juror can follow that logic for themselves. Stidham does not provide further help on that point. Or, more accurately, any help he provides is not tied to the subject matter of his expertise. Therefore, the Court refuses to admit this testimony either.

If the Sauds wish Stidham to testify about any other accident reconstruction, the Court excludes that as well. The only remaining conclusion in the report that the Court can identify is that "if the Ford Escape would have been left in reverse, Ms. Saud would not have been able to exit the Ford Escape without the vehicle rolling." (Doc. 64-1, #2092). On one hand, it is uncontroversial that the grade of the driveway caused the vehicle to roll if left in reverse. (*See* Doc. 64-5, #2210 (Ford's expert agreeing grade would cause vehicle to eventually roll)). On the other hand, to the extent this means that the only way the vehicle temporarily stayed in place was due

25

to false park, Stidham failed to conduct any analysis of the other possibility: the uneven cracks in the driveway.

Failing to rule out alternative causes is "fatal to the admissibility of an expert's opinion." *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 771 (6th Cir. 2025) (quotation omitted). While not mentioned at all in his initial report, Stidham recognized the uneven driveway as an alternative cause at his deposition: "[w]hen you put this vehicle in reverse, *aside from it being blocked by a sidewalk*, it's going to immediately roll back on that grade." (Doc. 59, #1072 (emphasis added)). Stidham engaged with this slightly more in his rebuttal report by disagreeing with Ford's reconstructionist's opinion that the uneven driveway is the most likely explanation. (Doc. 66-1, #2299). But his only rebuttal evidence is a marked photograph from Susan's deposition showing where her front bumper allegedly was, and then several pages of notes and photographs, supposedly taken by Susan after her deposition, showing a different location of her vehicle. (*Id.* at #2302–06). Stidham simply adopts these photographs and statements as his analysis that an obstruction could not be a potential alternative explanation.

Stidham failed to collect any measurements or analyze the scene beyond repeating Susan's post-deposition testimony. In his rebuttal report, Stidham stated that the "most accurate way to determine the location where Mrs. Saud stopped and parked her vehicle before she exited the vehicle the second time is by doing so at the accident scene." (*Id.* at #2302). But Stidham did not do this when he was at the scene of the accident with Susan. (Doc. 59, #1039, 1067–68). When questioned about this

26

alternative, Stidham acknowledges that the driveway "was all broken up and had ridges," (*id.* at #1061), but he did not take any measurements about the difference in height between parts of the driveway, did not create a scene diagram about where the vehicle likely was, and did not use testimony, such as whether or not Susan had cleared the door when she exited the vehicle, to estimate where the vehicle was or how far it rolled, (*id.*). Essentially, Stidham did not take any steps to collect the data that would have been necessary to evaluate whether an obstruction could have caused the temporary stop.

Stidham has already been excluded from opining in a different case because he "articulate[d] no cognizable basis or explanation in his report … as to how the [photographs] alone affirmatively substantiate[d] [Plaintiff's] version of the accident over that of Defendants." *Wagers v. Hotchkiss*, No. 6:22-cv-75, 2025 WL 646983, at *6 (E.D. Ky. Feb. 27, 2025). Because of that, the *Wagers* court held that "[c]ritically, he [did] not link his experience, methodologically, to the proffered views." *Id.* Here, Stidham admits that he failed to "take the vehicles that are involved or at the scene of an incident, take measurements, and see whether or not it's possible for vehicles to be positioned in a certain way." (Doc. 59, #1068–69). Stidham only uncritically "repeat[ed] information gleaned from external sources." *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 525 (5th Cir. 2013) (citation omitted). Without any analysis of his own, Stidham failed to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. With that, the Court excludes Stidham's remaining testimony.

27

In sum, the Court grants in full Ford's Motion to Exclude Joseph Stidham (Doc. 70) because his testimony is either unreliable or unhelpful to the jury.

### 2. The Court Admits Paul Stoloff's Expert Testimony Regarding the Feasibility of an Automatic EPB, And Tentatively Admits His Testimony Relating to Causation, But It Excludes His Other Testimony.

The Court next addresses the Sauds' proposed design expert, Paul Stoloff. (Doc. 82, #5222). He previously worked as a mechanical engineer for Chrysler[9] where he was responsible for the "entire EPB system" for the 2014 Jeep Cherokee, including oversight of Chrysler's automatic parking brake feature, SafeHold. (Doc. 60, #1212; Doc. 82, #5222; *see also* Doc. 64-3, #2113–14 (describing experience with EPB)).

Because much of Stoloff's report centers on SafeHold and Ford's ability to adopt a similar feature, the Court describes it in some detail before proceeding. Broadly speaking, SafeHold is Chrysler's name for an automatic EPB that applies when the vehicle infers that a driver is exiting the vehicle without properly securing it. (Doc. 64-3, #2114). To make that inference, it relies on a specific algorithm composed of seven conditions that are reported by various sensors in the vehicle:

1. Vehicle Ignition ON …
2. Vehicle speed below a 4kph (2.5 mph) threshold
3. Transmission NOT in PARK
4. No accelerator pedal input …
5. No service brake input …
6. Driver's door open …
7. Driver's seat belt unbuckled.

---

[9] The company is referred to as Chrysler in Plaintiffs' Response (Doc. 87), but alternately called FCA in Stoloff's Report (Doc. 64-3). Because the parties most often refer to it as Chrysler, the Court will stick with that name.

(*Id.*) (capitalization in original). When the car detects that the last of the seven conditions is met (such that all seven are true at once), the vehicle applies the EPB, i.e. SafeHold. (*Id.*). The goal of this feature was to prevent "unintended vehicle movement," also known as rollaways. (*Id.*). Chrysler first introduced SafeHold in the 2014 Jeep Cherokee, which was announced to the public in November 2013. (*Id.*).

With that background in mind, Stoloff opined regarding: (1) the possibility of false park and how it could have interacted with an automatic EPB, (*Id.* at #2115); (2) Ford's awareness of an automatic EPB feature, (*id.* at #2117–22); (3) the known risk of vehicle rollaways, specifically due to driver error, (*id.* at #2122–25); and (4) the feasibility of implementing an automatic EPB in Ford vehicles, (*id.* at #2115, 2123–29). Based on those findings, Stoloff concludes that "[i]f the 2018 Ford Escape driven by Ms. Saud had been equipped with a strategy such as SafeHold, or one similarly designed and intended, the rollaway that Ms. Saud experienced would most likely not have occurred." (*Id.* at #2116). And he also asserts that the lack of an automatic EPB means that the Ford Escape had a "defect in design." (*Id.* at #2131).

No one disputes whether Stoloff is qualified to serve as an expert on EPBs. Rather, Ford moves to exclude Stoloff's testimony first because he admits he is not an expert in false park and provides only sparse detail on that front. (Doc. 69, #2372). Next, Ford argues that his opinions about the feasibility of an automatic EPB in the 2018 Escape are unreliable and amount to little more than his "say-so." (*Id.* at #2373–78). Furthermore, Ford contends Stoloff's expert testimony would not pass Rule 403's balancing test because it would mislead jurors as Stoloff focuses only on feasibility,

29

while the legal standard calls for weighing the risks and benefits, of which feasibility is only one. (*Id.* at #2378–80).

The Sauds, in turn, argue that Stoloff is an "eminently qualified mechanical engineer" who can offer an expert opinion based on this experience. (Doc. 86, #5340, 5349–51). Further, the Sauds dispute that Stoloff concluded false park was a design defect, although they acknowledge he claims he replicated false park and that it contributed to the accident. (*Id.* at #5351–52). And they otherwise argue that Ford "nitpick[s]" Stoloff's report when these issues are more appropriate for cross-examination. (*Id.* at #5354–55).

The Court will first address Stoloff's comments about false park before moving to the alleged risk of vehicle rollaways, the feasibility of an automatic EPB in the 2018 Escape, and his causation opinion.

### a. The Court Excludes Stoloff's False Park Opinion Because It Is Unreliable.

Stoloff's report contains one paragraph describing false park in the subject vehicle. (Doc. 64-3, #2115). There, he claims that while inspecting the vehicle:

> [A] "False PARK" condition was demonstrated on the subject vehicle. Upon witnessing this demonstration, I attempted to duplicate the condition, and was able to do so quite easily and repeatedly. During the False Park condition, the transmission indicator indicated neither Park nor Reverse. A failure to properly achieve a PARK condition such as this could have been used as an input signal to automatically apply the EPB upon driver exit of the vehicle.

(*Id.*). Stoloff was present for Stidham's false-park tests and seemingly participated. (Doc. 60, #1180). For the reasons described above, though, *see* supra Law & Analysis (L&A), Part A.1, Stidham's tests do not meet the standards of reliability set out in

30

Rule 702. Stoloff's own testing seems to suffer from the same flaw: working backwards from a set outcome.

Beyond that, Stoloff's claims are weakened by his concessions at his deposition. There, he admits that he is not an expert in false park. (Doc. 60, #1178 ("Q: And so you would agree even today, July 2, 2025, you are not an expert in false park, correct? A: I am not.")). Indeed, he readily admits that he isn't "making any claims that that's, in fact, what happened." (*Id.* #1179; *see also id.* #1180 ("I have no way of knowing whether [false park is] what happened in this case, so I'm not making that claim.")). Instead, he is merely leaving it open as a "possibility." (*Id.* at #1179–80). And he concedes "this was not a scientific test" where either he or Stidham collected data. (*Id.* at #1181). Instead, it was an "evaluation," although he does not explain the difference. (*Id.*). And even in his "evaluation," he concedes they did not shift in the way Susan testified she did. (*Id.* at #1188). For the reasons already discussed above, this does not meet Rule 702's reliability standards, so the Court will exclude all of Stoloff's opinions about the possibility of false park and whether it occurred here.

> **b.** **The Court Admits Stoloff's Feasibility Opinion, And Tentatively Allows His Causation Opinion, But Excludes the Remainder.**

The rest of his report is not so simple. Generally, Ford challenges Stoloff's opinion as only based on his experience and lacking a reliable methodology to "meaningfully evaluate" the risks and benefits of each design here. (Doc. 69, #2373–74). True, "experience alone cannot establish the reliability of his testimony." *United States v. Biden*, No. 2:23-cr-599, 2024 WL 3950676, at *4 (C.D. Cal. Aug. 27, 2024).

31

On the other hand, it is not the case that "proffered testimony must be accompanied by rigorous step-by-step explanation in order to be admissible." *Amato ex rel. Amato v. Syntex Lab'ys, Inc.*, 917 F.2d 24, 1990 WL 163941, at *2 (6th Cir. 1990) (Table). That said, "[i]f the [expert] is relying solely or primarily on experience, then the [expert] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Rehn v. City of Seattle*, No. 3:23-cv-1609, 2025 WL 1810136, at *3 (W.D. Wash. July 1, 2025) (citation omitted).

Stoloff has over thirty-two years of experience in automotive engineering and design, specifically in brake systems. (Doc. 64-3, #2111). Moreover, he dedicates an entire section of his report to detailing his specific experience with EPBs. (*Id.* at #2113–14). He was the Engineering Technical Lead for Chrysler for designing the EPB for the 2014 Jeep Cherokee. (*Id.* at #2113). And he supervised the development of the entire EPB system, specifically the decision to create an automatic feature. (*Id.* at #2114). He certainly possesses relevant experience, so the only question is whether he adequately explains how that experience leads to the particular opinions he intends to offer here.

Start with his opinion that it would have been feasible for Ford to implement an automatic EPB. The Court concludes that he has a basis for offering that opinion. As noted, he oversaw such an implementation at Chrysler. He understands how the TRW components, sensors, electronic bus, and controller work together to implement

a system. (*Id.* at #2115–17). And he is thus in a position to opine on whether, as a technical matter, Ford could have accomplished that here.

But when it comes to causation, things get a little trickier. On the causation front, Stoloff opines that if Ford had implemented the technically feasible automatic EPB into the 2018 Escape, Susan's rollaway "would most likely not have occurred." (*Id.* at #2116). In offering that opinion, though, Stoloff does little work to connect his experience and knowledge of how automatic EPBs work to the facts of this case, which Rule 702(d) requires. As Ford points out, "[a]utomatic EPB is [] not a monolithic feature." (Doc. 95, #5654). Like SafeHold, engineers program automatic EPBs to apply based on a set of conditions. (Doc. 64-3, #2114). When those conditions are met, the vehicle infers the driver is exiting without properly securing the vehicle. (*Id.*). As Stoloff himself described it, "it's up to the Ford engineers, or any carmaker's engineers to come up with their own set of conditions, entry conditions, for any system, whether it's [R]eturn to [P]ark, or SafeHold, or any other system." (Doc. 60, #1207).

In other words, it is not clear to the Court that Stoloff has identified a uniform set of conditions that he contends automakers should use to trigger an automatic EPB. Indeed, Stoloff specifically disclaimed any ability to do so: "in no way would I suggest that [SafeHold's conditions] are in fact the conditions Ford should choose for an auto EPB feature. They know their vehicle architecture better than me, and they are in a better position to choose those conditions." (Doc. 64-3, #2121). For example, when Ford later implemented Return to Park in the 2020 Escape, Stoloff states that

33

it relied on three conditions. (*Id.* at #2124; Doc. 60, #1207).[10] Yet SafeHold relied on seven conditions. (Doc. 64-3, #2114). And these entry conditions matter; depending on the conditions, a "given automatic EPB system might prevent one rollaway, but not another." (Doc. 95, #5654).

So, on the one hand, he opines that a "strategy such a SafeHold, or one similarly designed and intended," would likely have prevented this accident. (Doc. 64-3, #2116). But on the other hand, he has articulated remarkably little in terms of a basis to say why that would be the case.

That said, the Court reviewed his deposition transcript and was unable to locate any point at which he was asked to further explain the basis for what appears to be his belief that any reasonably designed automatic EPB would have stopped the Ford Escape here. And given his experience with automatic EPBs, the Court concludes that he may have a legitimate (if as yet unexplained) basis for asserting that is so. Thus, the Court will tentatively allow him to testify on this topic, assuming that he can lay a foundation consistent with the opinions that he has already expressed.

But that is as far as the Court will go in terms of allowing him to testify. More specifically, the Court will not allow him to testify that the vehicle is "defective." Determining that a product is defective under Ohio law requires comparing the

---

[10] At Stoloff's deposition, he disputes whether there are only three conditions and he "may have left some out" of his report, but that there were three "significant with respect to functionality." (Doc. 60, #1207). The point remains the same though: the entry conditions vary between automatic EPB designs.

potential risks associated with its design, as identified in Ohio Revised Code § 2307.75(B), to the benefits of that design, as identified under § 2307.75(C). But Stoloff's discussion of those potential risks and benefits is cursory at best. As described above, an automatic EPB triggers the parking brake based on information that it gleans from various sensors, from which it infers the driver has left the vehicle while it is still in gear.

That sounds great in theory. But in the real world, sensors fail, controllers or wiring short circuit, and fuses blow. Any of those could lead to an automatic EPB engaging at inopportune times. Indeed, even a quick Google search shows that the internet is awash with customer complaints about automatic EPBs wrongfully engaging. And if that were to happen while a vehicle were driving down the highway, that could create a safety risk. Indeed, Stoloff testified he was aware of occasions where Chrysler's EPB had done just that (although not as a result of the SafeHold feature), and he acknowledged that could be a dangerous situation. (Doc. 60, #1211).

Against that backdrop, Stoloff offers only the following:

> While an Auto EPB on improper driver exit may on some occasions result in customer confusion or annoyance, the benefits outweigh the risk, and these issues can largely be overcome through appropriate product design.

(Doc. 64-3, #2131). His opinion, as stated, is too thin and conclusory to serve as an admissible expert opinion—how many "occasions," how much "confusion or annoyance," and how does this harm compare to the risk of rollaways and the likely injuries associated with them? At the very least, the risk of undue prejudice from such testimony far outweighs any probative value that such an opinion would

35

provide. *See* Fed. R. Evid. 403. And here, the Court is less convinced that Stoloff will be able to provide an adequate foundation. So the Court tentatively excludes his opinion about the risk/benefit balancing. That said, the Court will allow Stoloff to try to establish a foundation for that testimony, if he intends to offer it at trial.

In sum, the Court grants in part and denies in part Ford's Motion to Exclude Paul Stoloff (Doc. 69). The Court will permit Stoloff to testify regarding the feasibility of implementing an automatic EPB in the 2018 Escape, and will tentatively allow him to testify that the lack of that feature caused the harm here, but it tentatively excludes the remainder of his opinions. And given the tentative nature of the Court's ruling on some aspects of this testimony, the Court intends to discuss with the parties the best procedure for conducting the needed additional voir dire on these matters.

### 3. The Court Excludes a Portion of Dr. William Vigilante's Expert Opinions.

Last, at least for the motions to exclude, the Court addresses the Sauds' proposed ergonomics expert, Dr. William Vigilante. For the reasons explained below, the Court excludes some, but not all, of his expert testimony. The principal problem is that he offers essentially two opinions, but which are in direct conflict with one another.

### a. Dr. Vigilante's Opinions.

Ergonomics, also known as human factors, is the "science of designing and arranging products, work environments, and systems to comport with people's capabilities and limitations." (Doc. 88, #5379). In other words, it involves studying how people will likely interact with a given product, and consequently how to design

36

or mitigate risk in light of that behavior. Applying that here, Dr. Vigilante's conclusions broadly fall into, as noted, two categories: (1) Ford failed to follow a "design safety hierarchy" by failing to incorporate an automatic EPB in the 2018 Escape; and (2) the audible and visual warnings that the vehicle was not secured in Park were inadequate to warn a driver. (Doc. 64-4, #2188–89). Throughout his report, he also considers the possibility of false park, but doesn't have much to say about it beyond what Stidham said. (*See generally id.*).

### b. Dr. Vigilante Is Qualified.

While Ford does not expressly argue that Dr. Vigilante is unqualified to be an expert in this area, it begins its motion to exclude by attacking Dr. Vigilante's experience. (Doc. 68, #2346–47). Upon review, though, the Court finds that he is indeed qualified under Rule 702(a). Dr. Vigilante possesses a Bachelor of Science in Psychology, a Master of Science in Ergonomics (Human Factors) Psychology, and a Doctorate Degree in Psychology and Ergonomics. (Doc. 64-4, #2135; Doc. 79–30, #5131). On top of his education, he is certified as a Professional Ergonomist by the Board of Certification in Professional Ergonomics. (Doc. 64-4, #2135). Beyond that, he has worked in the field of psychology and human factors' research for over 30 years, specifically on "human-machine interaction, product design, hazard identification and mitigation, risk perception, and the design and testing of warning systems." (*Id.*). Dr. Vigilante spent most of his career, prior to becoming a forensic consultant, working as a Human Factors Engineer at IBM Corporation, where he focused on the "design and development of consumer and commercial products." (*Id.*).

37

Amongst other things, he has published about the "Hazard Perceptions of Consumer Products," served as Program Chair for the Human Factors and Ergonomics Society's Product Design Technical Group and Safety Technical Group, and is a representative on that society's ANSI 535 Safety Alerting Standards Committee. (*Id.*; *see* Doc. 79-30, #5132–34).

Ford argues that he is not an engineer and has not designed a passenger vehicle or alerts for such a vehicle. (Doc. 68, #2346–47 (citing Dr. Vigilante Dep., Doc. 61, #1312–15)). Admittedly, Dr. Vigilante's experience is not specific to work on passenger vehicles. But "[e]xperts need not [] have direct experience with the precise subject matter or product at issue." *Jackson*, 326 F. Supp. 3d at 388 (citation omitted). And the Court finds that his general knowledge from his experience in designing warning systems for IBM, his publications on the effects of product manual safety warnings and hazard perception, and his involvement in professional committees such as the Safety Alerting Standards Committee, all point towards his "scientific, technical, or other specialized knowledge" in the field of ergonomics. Fed. R. Evid. 702(a). So the Court finds he is qualified to opine in this area.

But qualifications are only part of the equation. Plaintiffs must also establish that Dr. Vigilante's opinions are relevant and reliable. So those are the topics to which the Court turns next, starting with false park, and then moving to the design-safety hierarchy, and ending with warnings.

c. **Dr. Vigilante's Findings Regarding False Park Are Inadmissible.**

Dr. Vigilante does not exactly opine about the possibility of false park on the facts here. Instead, he primarily relies on Stidham's report that false park is possible. (Doc. 64-4, #2144–46, 2150). In fact, he concedes he has not conducted any testing of his own nor witnessed false park personally. (Doc. 61, #1354).[11] Based on Stidham's report, Dr. Vigilante states that the "most likely explanation for why the vehicle did not move [upon Susan's exit] is that the shifter was in false Park." (Doc. 64-4, #2154). So throughout his report, he evaluates the potential risks with a design that allows false park, (*see, e.g.*, *id.* at #2134), and the adequacy of audible and visual warnings if the vehicle is in false park, (*see id.* at #2176–86 (contrasting false park and not in park warnings)).

The Court finds that Dr. Vigilante cannot testify about false park or its implications because the underlying expert is inadmissible. True, an expert can "base an opinion on another expert witness for a point of expert knowledge not personally possessed." *In re Davol, Inc.*, 546 F. Supp. 3d at 676 (citation omitted); *see Jackson*, 326 F. Supp. 3d at 396. While an expert can rely on inadmissible facts or data, the

---

[11] Susan also allegedly tested her vehicle to see if it was capable of achieving false park, and Dr. Vigilante also cites this testing. (Doc. 64-4, #2154). The Court is not in possession of any video showing so. But regardless, Susan's own testing is not reliable to establish the existence of false park. On one hand, her own finagling with the gear shifter may be "rationally based on [her] perception," but the actual innerworkings of the brake system and whether the brake is engaged or not requires "scientific, technical, or other specialized knowledge" outside of her realm as a lay witness. Fed. R. Evid. 701(c). Beyond that, Susan admits she shifted "more gingerly than I normally would to go into park" and it was "different than regular." (Doc. 54, #860). So any such testing is not similar to the facts of the case, and it is not relevant. Thus, Dr. Vigilante cannot rely on it either.

underlying facts must be the kind that "experts in the particular field would reasonably rely on … in forming an opinion on the subject." Fed. R. Evid. 703. And, "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006) (quoting *Mohney v. U.S. Hockey, Inc.*, 300 F. Supp. 2d 556, 565 (N.D. Ohio 2004)). Moreover, even though the strength of the underlying factual basis of the expert's opinion may affect its credibility (which is an issue for the jury) rather than its admissibility, the Court may exclude the expert's opinion "if it is fundamentally flawed or unsupported." *Id.* (citations omitted).

Dr. Vigilante entirely relies upon Stidham's report to establish false park as a possibility. (Doc. 64-4, #2144–46). But the Court has already concluded that Stidham's report is unreliable and therefore inadmissible because Stidham's testing was ends-oriented. *See* supra L&A, Part A.1. For the reasons more fully explained above, no reasonable expert could base their opinions on such testing that utterly failed to follow the scientific method. Without Stidham's report, Dr. Vigilante's comments on false park lack support. Thus, the portions of Dr. Vigilante's testimony on this issue fail to satisfy Rule 702(b) and must be excluded.

### d. The Court Allows Dr. Vigilante's Testimony Regarding the Design-Safety Hierarchy and Automatic EPB.

Dr. Vigilante's first principal finding is that "Ford failed to comply with the design safety hierarchy and integrate [an] automatic EPB safety feature into the design of the subject Escape … [which] caused or contributed to Susan Saud's injury."

40

(Doc. 64-4, #2189). Ford contests this conclusion because (1) it relies on Stoloff's opinion regarding the feasibility of implementing an automatic EPB, which itself is unreliable and inadmissible; and (2) the design safety hierarchy is misleading because it establishes a higher standard for manufacturers than Ohio law. (Doc. 68, #2351–56).

Start with the feasibility of implementing an automatic EPB into the 2018 Escape. Dr. Vigilante primarily relied on Stoloff's report for this point, but he also cites other vehicles that had this feature. (Doc. 64-4, #2174; *see* Doc. 61, #1361, 1365). As stated above, an expert can "base an opinion on another expert witness for a point of expert knowledge not personally possessed." *In re Davol, Inc.*, 546 F. Supp. 3d at 676 (citation omitted). The Court reviewed Stoloff's expert opinion above and concluded that, while portions of his testimony should be excluded, he could testify regarding the feasibility of an automatic EPB in the 2018 Escape. *See* supra L&A, Part A.2. Unlike Dr. Vigilante's reliance on Stidham's inadmissible false-park testing, he can properly rely on Stoloff for this point.

Now turn to the design-safety hierarchy. As the name suggests, it is apparently a hierarchy for the best ways to address safety risks in products. (Doc. 64-4, #2167). Specifically, the design-safety hierarchy states:

1. Eliminate or reduce risks in the design and redesign processes.
2. Reduce risks by substituting less hazardous methods or materials.
3. Incorporate safety devices.
4. Provide warning systems.
5. Apply administrative controls (work methods, training, work scheduling, etc.).

6. Provide personal protective equipment.

(*Id.*). When in action, it "dictates that if the hazard can be reasonably designed-out or eliminated from the product, the manufacturer/designer has the responsibility to do so and not rely upon a lower step." (*Id.*). In other words, a manufacturer starts at the top of the list and minimizes risk in the design as much as possible before moving to the next item on the list. (*Id.*). Most relevant here, eliminating risk in the design comes several steps before adequate warnings. (*Id.*).

Based on Stoloff's conclusion that an automatic EPB was feasible for the 2018 Escape, Dr. Vigilante concluded that Ford failed to comply with this design-safety hierarchy because it did not eliminate the risk of vehicle rollaways by implementing this alternative design. (*Id.* at #2189). Not only did Ford not comply, Dr. Vigilante claims this failure "was improper, unreasonably dangerous, rendered the subject vehicle defective … unsafe for its intended purpose, and caused or contributed to Susan Saud's injury." (*Id.*).

The Court analyzes those two related opinions separately. As to the first, the Court finds that Dr. Vigilante can testify that Ford failed to comply with the design-safety hierarchy. To the extent that this design-safety hierarchy is a recognized aspect of the 'practice' of ergonomics, which is what Dr. Vigilante suggests, the Court sees no reason why he should not be able to offer his opinion that Ford failed to comply with that practice here. As noted, he is entitled to rely on Stoloff's feasibility opinion. And based on his own expertise, he can assert that as a matter of good ergonomics practice, a manufacturer should implement feasible safety features, rather than merely warn about the danger.

42

But, when Dr. Vigilante takes the next step of opining that Ford's alleged failure on this front made the vehicle "unreasonably dangerous," or "defective," that goes too far. To start, whether or not a vehicle is "unreasonably dangerous" or "defective" are legal terms that go to the ultimate question of liability. As the Sixth Circuit has explained, though, while "an expert's opinion may 'embrace[ ] an ultimate issue to be decided by the trier of fact, the issue embraced must be a factual one." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (cleaned up) (quoting Fed. R. Evid. 704(a)). "The distinction, although subtle, is nonetheless important." *Id.* And just as in *Berry*, the terms at issue are legal terms, and "[i]t is the responsibility of the court, not testifying witnesses, to define legal terms." *Id.* Allowing an "expert's testimony in this regard [would] invade[] the province of the court." *Id.*

In short, Dr. Vigilante is free to testify what the ergonomics community might think about the appropriate approach to design. But he cannot suggest to the jury that the law has adopted his view of ergonomic best practices as the guidepost to defective design.

### e. The Court Excludes Portions of Dr. Vigilante's Testimony Regarding the Adequacy of the Warnings.

Now turn to the remainder of Dr. Vigilante's testimony: the adequacy of the warnings. On this front, Dr. Vigilante offered opinions about the alleged inadequacy of Ford's chime alerts and dashboard messaging about the driver leaving the vehicle while it is still in gear. (Doc. 64-4, #2175–88). Specifically, he opines that the warnings should have been louder or more intrusive. (*Id.*). Importantly, though, he

never says that, even if reconfigured in that way, they would be adequate. In fact, he says the exact opposite:

> My definition consistent with the design safety hierarchy is *a warning system cannot be adequate if there is a feasible guide or guarding solution available. So there was a … guarding solution available; therefore, by definition an adequate warning cannot be provided.*

(Doc. 61, #1383 (emphasis added)). The Court finds this testimony is inadmissible as well.

Dr. Vigilante's opinion that any warning would have been inadequate given the feasibility of an alternative design renders his opinion about what would have constituted effective warnings unreliable or even irrelevant. A district court analyzed this precise issue in *Gaddy v. Terex Corporation*, No. 1:14-cv-1928, 2017 WL 11629330, at *3–5 (N.D. Ga. Nov. 2, 2017). There, a human-factors expert opined about the adequacy of the warnings and how they caused the plaintiff's injuries, but then also admitted that he was "reluctant to create warnings … because you can't fix a bad design with a warning … We're at the bottom end of the hazard control hierarchy and that's not where this problem needed to be fixed." *Id.* at *4. The *Gaddy* court held that the expert's warnings opinions were irrelevant because "[h]e cannot opine, on the one hand, that Defendants' failure to warn about known dangers caused Plaintiff's injuries, while, on the other hand, opining that a warning would not have made a difference in this case." *Id.* at *5. To put a finer point on it, the expert himself had found that "this is a case about structural design and not warning adequacy," so his warnings testimony was irrelevant. *Id.*

44

The same is true in spades here. Dr. Vigilante concludes that "Ford's failure to provide an adequate or effective warning system upon the driver opening the door with the vehicle not in Park was … a producing or proximate cause of the subject collision and the injury to Susan Saud." (Doc. 64-4, #2189). But at the same time, he also asserts that "*any* warning Ford provided instead of the available safety feature would not be considered adequate regardless of how effective it may or may not be." (*Id.* (emphasis added)). This is the precise contradiction in *Gaddy*. Dr. Vigilante cannot claim that the failure to warn caused Susan's injuries, "while, on the other hand, opining that a warning would not have made a difference" due to alleged design flaws. 2017 WL 11629330, at *5. So this Court also finds that Dr. Vigilante's warnings opinions should be excluded.

The Sauds argue that Dr. Vigilante is not engaging in such a contradiction. (Doc. 88, #5392). Specifically, they dispute that he ever claimed a failure to warn caused Susan's injuries. (*Id.*). Whether or not the warnings opinions are "secondary," (*id.*), though, Dr. Vigilante clearly states in the summary of his findings that "Ford's failure to provide an adequate or effective warning system upon the driver opening the door with the vehicle not in Park was unreasonably dangerous, rendered the subject Ford Escape defective and unreasonably dangerous, and a *producing or proximate cause* of the subject collision and the injury to Susan Saud," (Doc. 64-4, #2189 (emphasis added)). There is no mistaking this causation opinion, so *Gaddy* is on point.

That said, the Court is less convinced that this is a relevance problem, as *Gaddy* suggests. 2017 WL 11629330, at *5. Relevance is a low bar, and testimony about the effectiveness of the warnings or alternatives seems at least somewhat relevant to resolving a failure to warn claim. Rather, the problem, at least as the Court sees it, is that the contradictory nature of the two opinions ((1) no warning could suffice, but (2) these warnings would have been better), will tend to confuse the jury and create undue prejudice. So at the end of the day, it strikes the Court more as a Rule 403 problem than a Rule 702 relevance problem. But either way, the end result is the same: Dr. Vigilante cannot testify as to his opinion about alternative warnings.

In sum, the Court grants Ford's Motion to Exclude Dr. Vigilante's Expert Testimony (Doc. 68) in part. He can testify about the design-safety hierarchy, but he cannot offer opinions about whether the failure to include an automatic EPB made the 2018 Ford Escape "unreasonably dangerous" or "defective," nor can he opine about other more effective, but nonetheless still inadequate, warnings.

## B.    Motion for Summary Judgment

With that settled, turn to Ford's Motion for Summary Judgment (Doc. 67). Ford requests the Court grant summary judgment on all of the Sauds' claims. (*Id.* at #2307). The Sauds' first claim, broadly speaking, is a vehicle defect claim. (Doc. 1, #2–4). As a reminder, their Complaint raised four theories of defect: (1) a manufacturing defect in violation of Ohio Revised Code § 2307.74, (2) a design defect in violation of § 2307.75, (3) a failure to warn in violation of § 2307.76, and (4) misrepresentation in

violation of § 2307.77. (*Id.*). But the Sauds now concede they are "not mak[ing] a manufacturing defect claim." (Doc. 82, #5205). Because the Sauds have dropped that claim, the Court will grant summary judgment in favor of Ford on it without further analysis.[12]

As to the remaining three theories, under Ohio's Product Liability Act (OPLA), a plaintiff must prove that "(1) there was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendants; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss." *Gist v. Gen. Motors Corp.*, 130 F. App'x 9, 10 (6th Cir. 2005) (quoting *State Farm Fire & Cas. Co. v. Chrysler Corp.*, 523 N.E.2d 489, 493 (Ohio 1988)). For the failure to warn and misrepresentation claims, the Court finds that the Sauds lack sufficient evidence to create a genuine dispute as to causation, so the Court grants summary judgment in favor of Ford. For the design defect claim, however, the Court finds that the Sauds offer just enough evidence to survive summary judgment.

---

[12] The Sauds disclaim any manufacturing defect "even though the ability to place the subject vehicle's mechanical shifter in a 'false park' … is quite easily achieved, and could be a manufacturing defect." (Doc. 82, #5205). Beyond that, the Sauds also appear to drop any claim that false park is a defect in and of itself. Rather, they seem to rely on false park only as part of their explanation of why the failure to have an automatic EPB constituted a design defect.

1.     **The Court Denies Summary Judgment to Ford on the Design Defect Claim.**

a.     **Expert Testimony Is Required to Support the Design Defect Claim Here.**

Before evaluating the merits of the design defect claim, the Court first begins with a preliminary issue, whether the Sauds need expert testimony to establish their design defect case here. The Court answers that question in the affirmative.

As a general matter, expert testimony is not required for every design defect claim. *Jones v. Staubli Motor Sports Div. of Staubli Am. Corp.*, 897 F. Supp. 2d 599, 612 (S.D. Ohio 2012). If the disputed product and alternate designs are relatively simple, then a plaintiff need not present an expert and may rely upon only circumstantial evidence of the defect. *Id.* But if the design defect is sufficiently complex, then expert testimony becomes necessary. *Id.*

Under that framework, the Court finds that expert testimony is needed in this case. The innerworkings of a modern vehicle's brake system and gear shifting system are sufficiently complex. *See id.* (requiring expert for automotive fueling system). Beyond that, a lay juror cannot fully evaluate the feasibility of an automatic EPB in a 2018 Escape, how that automatic EPB would or would not operate, or the operation of similar features in other vehicles without any expert testimony. For those reasons, an expert's guidance on these topics is necessary to prove the design defect that the Sauds claim here.

b.      **The Sauds Have Sufficient Admissible Evidence to Create a Genuine Dispute over the Availability of a Feasible Alternative Design and Causation.**

Causation gets short shrift in the parties' summary judgment briefing, instead popping up mostly in the motions to exclude. But to prevail on a product liability claim, a plaintiff must demonstrate the defect was a direct and proximate cause of the plaintiff's injuries. *Gist*, 130 F. App'x at 10. In other words, "[a] product will not be considered defective unless the plaintiff demonstrates that a practical and technically feasible alternative design to the product was available *and would have prevented the harm for which the plaintiff seeks to recover*, without substantially impairing the usefulness of the product." *Zang v. Cones*, 34 N.E.3d 955, 961 (Ohio Ct. App. 2015) (citing Ohio Revised Code § 2307.75(F)). For the alleged design defect, the Sauds contend that Ford defectively designed the 2018 Escape because it failed to "design (program) the [EPB] to automatically apply 'to prevent inadvertent vehicle movement due to customer error [in] not selecting Park before exiting [the] vehicle.'" (Doc. 82, #5205). So the Sauds need to show a "practical and technically feasible" way to implement an automatic EPB that would have prevented Susan's injuries here.

Typically, deciding whether a feasible alternative design exists is a factually intensive inquiry best left to juries. And here, as noted, the Court has concluded that Stoloff can testify about the technical feasibility of including an automatic EPB. *See* supra L&A, Part A.2. So if the jury credits that testimony, that could perhaps suffice on that front.

That said, the Court repeats its earlier admonition. As noted, Ohio law requires a plaintiff to show a "practical and technically feasible alternative design."

49

*Zang*, 34 N.E.3d at 961. And that combination requires a risk-benefit balancing. Indeed, the statute specifically says that, in connection with advancing a design defect claim, *both* the risks and benefits "shall be determined." Ohio Rev. Code § 2307.75(B) (risks); § 2307.75(C) (benefits). And if the Sauds fail to present evidence on that risk-benefit balancing at trial, the Court will not hesitate to award judgment as a matter of law to Ford on this claim.

Separately, causation is likewise a close call. But, as noted, the Court is tentatively inclined to allow Stoloff to testify on that issue. *See* supra L&A, Part A.2. And assuming that happens, and assuming the jury credits that testimony, that should be enough on that issue, as well.

In sum, the Court concludes that the Sauds have offered enough, if barely to move beyond summary judgment. Whether they will have enough to support a jury verdict on this claim at the end of the case, though, is still very much an open question.

### 2. The Court Grants Summary Judgment in Favor of Ford on the Failure to Warn Claim.

The Sauds' next defect theory is a failure to warn. (Doc. 1, #3). The Court finds this claim fails as a matter of law. To start, the OPLA states that a "product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge." Ohio Rev. Code § 2307.76(B). The risk that a vehicle will move if the driver does not shift into Park is open, obvious, and a matter of common knowledge. The Sauds concede as much.

50

(Doc. 82, #5235; Doc. 85-1, #5309 ("Of course, I knew the shifter should be placed in Park before getting out of the vehicle.")). That alone could doom the Sauds' claim.

But the Sauds argue that is not the relevant risk. Rather, "[t]he risk is that a driver may exit the vehicle erroneously believing the vehicle is 'securely latched' in Park, when it is not in Park." (Doc. 82, #5235). In other words, the vehicle inadequately warns that the vehicle is not in Park. Assuming that this is a risk that Ford should have known about, *see* Ohio Rev. Code § 2307.76(A)(1)(a), the Sauds fail to show that the allegedly inadequate warning was the proximate cause of Susan's injuries. A plaintiff must demonstrate that not only that the product failed to warn, but that "the defect was the proximate cause of the claimant's injury." *Rees v. W.M. Barr & Co., Inc.*, No. 2:15-cv-2821, 2017 WL 4349080, at *3 (S.D. Ohio Sep. 28, 2017) (first citing Ohio Rev. Code § 2307.76 and then citing *McConnell v. Cosco Inc.*, 238 F. Supp. 2d 970, 976 (S.D. Ohio 2003)). Presumptions play a role in this analysis under Ohio law. In particular, Ohio follows what it "is known as the 'read and heed' rule." *Boyd v. Lincoln Elec. Co.*, 902 N.E.2d 1023, 1032 (Ohio Ct. App. 2008). Under this rule, "there is a presumption that an adequate warning, if given, will be read and heeded." *Id*.

Ford provides three kinds of warnings about hazards that may arise in connection with parking: the owner's manual, a visual display, and audible alerts. The owner's manual specifically states:



(Doc. 63-2, #1676, 1687). On top of that, when the driver opens the door and the vehicle is in Reverse, or any other gear, the following message pops up on the display above the steering wheel:



(Doc. 68, #2348). Additionally, an audible alert will chime. (Doc. 67, #2326).

The Sauds acknowledge all three of these warnings. (Doc. 82, #5233–34). But Susan admits she doesn't pay much attention to them. As for the owner's manual, she says she "did not read the whole thing, but [she] did review it, yes. And the quick reference guide." (Doc. 54, #863). And she "did not know, and apparently did not read, that portion of the Owner's Manual which states that the electric park brake does not automatically apply." (Doc. 85-1, #5309).[13] And for any visual display, she claims that she "do[esn't] look at the dashboard to get out of the car. [She] look[s] at the dashboard

---

[13] Although she did not read that portion, she paradoxically claims that she "understood that you pulled up on the park brake button for it to engage," showing that she did not presume it was automatic. (Doc. 85-1, #5309).

when [she's] driving." (Doc. 54, #856 (discussing her current vehicle, a 2015 Toyota Sienna)). And she admits that she ignores the auditory warnings: "[I]t dings for a million things … It just makes a noise, and it's kind of all the same noise, so [she] do[es]n't even pay attention to them for the most part." (*Id.* at #843). In short, Susan admits that she did not "heed" the instructions that Ford gave. And that is a problem. *See Boyd*, 902 N.E.2d at 1032. That is especially true as the warnings strike the Court as adequate on their face, if read and heeded.

Moreover, the Sauds do not offer any evidence to the contrary. Dr. Vigilante is their warnings expert. But, even if his opinions on this front were admissible, he cannot opine that the warnings Ford gave were inadequate. That is so for one simple reason—under his design-safety hierarchy, because Ford allegedly could have eliminated the problem through a "feasible safety feature" (i.e., automatic EPB), then "any warning Ford provided instead of the available safety feature would not be considered adequate regardless of how effective it may or may not be." (Doc. 64-4, #2175). So the Court cannot take at face value his later opinion that Ford should have implemented different chimes or visual indicators. By his own admission, they, too, would have been inadequate. And, in any event, he offers no evidence suggesting that the warnings he proposes would in fact have prevented Susan, who doesn't "even pay attention for the most part" to her vehicle's chimes, from suffering the accident that occurred here. Against that backdrop, claiming that she "maybe would have done something at least different" is "mere conjecture and speculation." *Vermett v. Fred Christen & Sons Co.*, 741 N.E.2d 954, 973 (Ohio Ct. App. 2000). In short, the Sauds

53

have failed to create a genuine dispute over whether any failure to warn about the lack of an automatic EPB was the proximate cause of the injuries here.

Separately, the Court notes that the Sauds make several arguments regarding the adequacy of the warnings as to whether the vehicle was in false park. But as the Court has previously stated, the Sauds do not have any admissible evidence establishing that false park likely occurred in the first place. Even if they did, it is still speculation to argue that Susan would have followed any warnings in that case either.

With that, the Court grants summary judgment in favor of Ford on the failure to warn claim.

### 3. Ford is Entitled to Summary Judgment on the Misrepresentation Claim.

The last defect theory the Sauds argue is that the vehicle failed to conform to Ford's express representations about it. (Doc. 1, #3). On that front, Ohio Revised Code § 2307.77 states:

> A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer. A product may be defective because it did not conform to a representation even though the manufacturer did not act fraudulently, recklessly, or negligently in making the representation.

Ohio law further defines representation as an "express representation of a material fact concerning the character, quality, or safety of a product." Ohio Rev. Code § 2307.71(A)(14). And if the plaintiff cannot identify a representation, then the claim must fail. *Cervelli v. Thompon/Center Arms*, 183 F. Supp. 2d 1032, 1045 (S.D. Ohio 2002). Furthermore, a plaintiff must establish four elements:

> (1) that the manufacturer made a representation as to a material fact concerning the character or quality of the manufacturer's product; (2) that the product did not conform to that representation; (3) that the plaintiff justifiably relied on that representation; and (4) that the plaintiff's reliance on the representation was the direct and proximate cause of the plaintiff's injuries.

*Monroe v. Novartis Pharm. Corp.*, 29 F. Supp. 3d 1115, 1128 (S.D. Ohio 2014) (quoting

*Mathews v. Novartis Pharm. Corp.*, No. 3:12-cv-314, 2013 WL 5780415, at *12 (S.D.

Ohio Oct. 25, 2013)).

Ford focuses its argument on the first element and argues that the Sauds have

"not identified any express representations Ford made to them about the Escape to

which the Escape did not conform." (Doc. 67, #2328). Without identifying an express

representation, it maintains that the misrepresentation claim must fail. (*Id.*).

The Sauds, in response, point to several statements they claim are express

representations of material fact. (Doc. 82, #5235–36). First, they argue that they

purchased the optional "Safe and Smart Package" for the Escape, and this was an

express representation promising a level of safety. (*Id.* at #5235 (citing Doc. 54, #844

(stating the Sauds purchased the "Safe and Smart" package)); Doc. 84-1, #5295

(same)). Second, they claim that Ford had made safety representations "for decades,"

including that its products were "state-of-the-art" and "safe to the fullest extent

possible." (Doc. 82, #5235–36 (first citing Docs. 78-29–32 (Ford's Safety Directives);

and then citing Doc. 79-29, #5119–27 (Ford's advertisements))). As to whether the

product conformed to those representations, the Sauds only assert: "It did not. Not

even 15 years after selling vehicles in foreign countries with auto EPB." (Doc. 82,

#5236 (citing Doc. 78-44, #4877–79 (listing foreign vehicles equipped with an

55

automatic EPB and "Key Out Apply" feature))). As for the final two elements, the Sauds argue that Susan justifiably relied on these safety representations when she purchased the Escape because she reviewed "online, everything it says about it" and "just said [she] wanted the safest car [she] can get." (Doc. 54, #844; Doc. 82, #5236). And "[c]ertainly, she expected to get a safer car than what Ford was selling in Zimbabwe in 2003." (Doc. 82, #5236). Lastly, the Sauds maintain that reliance was the direct and proximate cause of her injuries. (*Id.*).

The Court concludes that this claim fails because the Sauds' cited representations are either irrelevant to the accident that occurred here or too generic to support a misrepresentation claim. Start with the optional "Safe and Smart" package they purchased. (Doc. 54, #864). When asked what features were included with the package, Susan stated it included a lane-keeping system, adaptable cruise control, a collision warning, and a blind spot warning. (*Id.*). And she specifically agreed that this package didn't "have anything to do with the parking brake or return to park." (*Id.*). The Sauds have not alleged that any of these features were defective or otherwise unsafe. Perhaps the Sauds are attempting to stretch the name of this package, "Safe and Smart," into a general safety guarantee. But, if so, that is a step too far. In sum, the Sauds lack evidence that the vehicle did not conform to this representation.

As for the advertisements, the Sauds have not identified a specific advertisement that they relied on, as required. *Cervelli*, 193 F. Supp. 2d at 1045. Susan only alleges she reviewed the Escape "online, everything it says about it." (Doc.

56

54, #843). And in her more-recent affidavit, she claims that "[b]ased on years of Ford Motor company advertisements regarding the safety of their vehicles, [her] purchasing a new vehicle (the most expensive model), and selecting the optional Safe and Smart package, [she] took this as a representation that the Ford Escape had all available safety features." (Doc. 85-1, #5309).[14] As the description suggests, Susan fails to identify a specific advertisement or express representation. At most, the Sauds offer a series of printed advertisements. (Doc. 79-29). Ford argues these advertisements are irrelevant, and the Court agrees. (Doc. 98-1, #5697). They do not appear to mention the 2018 Escape, or any other recent vehicles, and there is nothing to suggest that Susan (or Abel) ever saw them, let alone relied on them. (*Id.*). So these cannot form the basis for the representation either.

Lastly, Ford's safety directives are too generic to serve as an express representation. The Sauds highlight Ford's statement that its vehicles are "state-of-the-art whenever practicable" and "safe to the fullest practicable extent." (Doc. 82, #5235). But their evidence of these representations is various policy statements Ford issued from 1984 to 2014. (Docs. 78-29–32).

Problems abound in the Sauds' efforts to rely on these directives. First, no evidence suggests that the Sauds ever viewed these "Safety Directives" prior to litigation or relied on them in purchasing the 2018 Escape. Even broadly construed,

---

[14] The Court notes that Ford objects to this as a "sham" affidavit because it contradicts her earlier sworn deposition testimony. (Doc. 98, #5686). For the claim regarding advertisements, the Court does not find this to be contradictory to her deposition testimony of reviewing online advertisements. The Court otherwise declines to decide if the remainder of the affidavit is contradictory or a "sham."

these would not qualify as "advertisements" that Susan testified she viewed. (*See* Doc. 54, #843–44).

Beyond that, these generic safety claims are not specific enough to create liability. *See Jordan v. Paccar, Inc.*, 37 F.3d 1181, 1185 (6th Cir. 1994). "Many enthusiastic subjective claims are made in the commercial marketplace, and many are obviously part of the commercial puffery to which ordinary consumers are inured." *Id.* Statements like "only your mother is more obsessed with your safety," (Doc. 79-29, #5119), "your safety is our top priority," (*id.* at #5125), or that Ford's policy is "to advance the state of the art in safety wherever practicable," (Doc. 78-32, #4507), are all ordinary forms of commercial puffery, *Jordan*, 37 F.3d at 1185; *see also Thompson v. DePuy Orthopaedics, Inc.*, No. 1:13-cv-602, 2014 WL 2874268, at *8 (S.D. Ohio June 24, 2014) ( "[A]n affirmation of the value of goods, the seller's opinions, or a commendation of the goods [] is not actionable").

In sum, the Sauds have failed to identify any express representation that Ford made to which it failed to conform. Thus, the Court grants summary judgment in favor of Ford on this claim as well.

### 4. The Court Leaves Plaintiffs' Loss of Consortium Claim Because the Design Defect Claim Survives.

A loss of consortium claim can proceed only if Plaintiffs can show Ford's liability based on an underlying tort. *See Paugh v. R.J. Reynolds Tobacco Co.*, 834 F. Supp. 228, 232 (N.D. Ohio 1993) (dismissing derivative claims, including loss of consortium claim, because the court rejected plaintiff's substantive claim). So this claim rises and falls with the design defect claim. Because the Court denied summary

judgment to Ford on the design defect claim, permitting that claim to proceed, *see supra* L&A, Part B.1, the Court denies summary judgment on the loss of consortium claim, too.

CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Ford's Motion to Exclude Expert Testimony of Dr. William Vigilante (Doc. 68), **GRANTS IN PART AND DENIES IN PART** Ford's Motion to Exclude Expert Testimony of Paul Stoloff (Doc. 69), and **GRANTS** Ford's Motion to Exclude Expert Testimony of Joseph Stidham (Doc. 70). With those exclusions, the Court **GRANTS IN PART** and **DENIES IN PART** Ford's Motion for Summary Judgment (Doc. 67). Specifically, the design defect claim and loss of consortium claim remain.

**SO ORDERED.**

March 31, 2026
 **DATE**

                            **DOUGLAS R. COLE**
                            **UNITED STATES DISTRICT JUDGE**